### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| American Dairy Queen Corporation, | |
| Plaintiff, | Case Number: 5:24-cv-1209 |
| v. | |
| UAM, LLC, | Jury Trial Demanded |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff American Dairy Queen Corporation ("ADQ"), by and through its undersigned counsel, brings this Verified Complaint against Defendant UAM, LLC ("UAM") and states and alleges as follows:

## I. INTRODUCTION

1.  ADQ is the franchisor and owner of the DQ® franchise system. UAM is a former franchisee who, until October 16, 2024, was authorized to operate a DQ® restaurant in Anahuac, Texas (the "Anahuac Restaurant" or "Restaurant") pursuant to a valid Franchise Agreement.

2.  Under the Franchise Agreement, UAM was required to comply with ingredient and product preparation procedures set by ADQ. Among other things, franchisees are required to use only fresh milk as liquid parts of malts and shakes, and they are prohibited from storing or using "rerun," which is soft serve mix that has already been run through the soft serve machine.

3.  ADQ's System Standards and Operations Manual identifies the storage and/or use of rerun as a Zero Tolerance violation, which means that ADQ will not tolerate this practice under any circumstances. Using or storing rerun is unsanitary, presents public health and safety risks,

and impacts product quality and uniformity. The violation of ADQ's Zero Tolerance Policy is grounds for immediate default and, if not cured, termination of a franchise agreement.

4.     UAM is aware of ADQ's strict prohibition on the storage or use of rerun. In fact, UAM's sole owner—Mr. Muhammad N. Aulakh—is a 50% owner of another DQ® restaurant in Texas that recently received a notice of termination for failure to comply with ADQ's Zero Tolerance Policy pertaining to the storage and use of rerun.

5.     Despite being fully aware of ADQ's Zero Tolerance Policy, UAM has not only permitted but trained its employees to store and use rerun to make shakes.

6.     On October 8, 2024, ADQ discovered that UAM was storing and using rerun in place of fresh milk in the preparation of its shakes and had even trained its employees to do so.

7.     Because of this violation, ADQ issued a *Zero Tolerance* Notice of Default on October 10, 2024. In the notice, ADQ reminded UAM of its contractual obligations to use only soft serve mix and supplies that are approved by ADQ, follow all of ADQ's product preparation procedures, and use only fresh milk as liquid parts of malts and shakes. ADQ warned that it would not tolerate use or storage of rerun and gave UAM 24 hours to cure its default, which is consistent with ADQ's Zero Tolerance Policy.

8.     On October 14, 2024, ADQ conducted a follow-up site visit and found that UAM was continuing to use rerun to prepare shakes at the Anahuac Restaurant. Accordingly, on October 16, 2024, ADQ terminated UAM's franchise agreement for the Anahuac Restaurant and instructed it to cease operating the Restaurant immediately and to cease using the DQ® Marks.

9.     To date, UAM has disregarded ADQ's termination notice and continues to operate the Anahuac Restaurant and to use the DQ® Marks in violation of its post-termination contractual obligations and federal law.

10.     UAM's unauthorized use of the DQ® Marks deprives ADQ of its right to control and manage the DQ® Marks and its brand. Unless enjoined, UAM's unlawful use is likely to cause irreparable harm to ADQ by undermining system uniformity, creating customer confusion, and diminishing customer goodwill.

11.     Accordingly, ADQ seeks a declaration that the franchise agreement has been lawfully terminated, and an injunction to prohibit UAM from continuing in its unlawful operation of the Anahuac Restaurant and use of the DQ® Marks.

## II. PARTIES

12.     Plaintiff ADQ is a Delaware corporation with its principal place of business at 8331 Normal Center Drive, 8000 Tower, Suite 700, Bloomington, Minnesota 55437.

13.     Defendant UAM, LLC is a Texas limited liability company, with a registered office at 4318 Green Tee Drive, Baytown, Texas, 77521. UAM is solely owned by Muhammad N. Aulakh, a resident of Texas. Mr. Aulakh is also UAM's registered agent.

14.     The Franchise Agreement was originally executed between ADQ's and UAM's predecessors. A true and correct copy of the Franchise Agreement is attached as **Exhibit A** (generally, the "Franchise Agreement" or "Agreement"). The Franchise Agreement has been assigned multiple times with ADQ's approval since it was initially executed. As relevant here, on or about September 1, 2019, then-franchisees Abbas A. Pahlavan and Jim A. Pahlavan assigned their interest in the Franchise Agreement to UAM, LLC. A true and correct copy of the assignment, guaranty, and consent is attached as **Exhibit B**. Mr. Aulakh signed a personal guaranty when UAM assumed the Franchise Agreement. (*See* Ex. B at 3.)

## III. JURISDICTION & VENUE

15.     This action includes claims brought under the Lanham Act, 15 U.S.C. § 1051 *et seq*. Accordingly, this Court has federal question jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

16.     In addition, the Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000. The defendant—UAM, LLC—is wholly owned by Mr. Aulakh, a Texas citizen, and thus UAM is considered a Texas citizen. ADQ is incorporated in Delaware and has a principal place of business in Minnesota, and thus is a citizen of Delaware and Minnesota. *See* 28 U.S.C. § 1332(c)(1). There is therefore complete diversity of citizenship between the parties.

17.     Venue is proper in this District pursuant to the parties' Franchise Agreement, which provides, "Venue for any cause of action arising under this contract, or in any manner growing out of or connected with same, shall lie in Bexar County, Texas . . . ." (Ex. A, Franchise Agreement § 11.)

18.     UAM is subject to general personal jurisdiction in this state because it is considered at home here by residing and maintaining its principal place of business in this state.

## IV. FACTUAL BACKGROUND

### A.  ADQ's Business and the Importance of Strict Health and Safety Rules

19.     The DQ® brand dates back to the 1940s, when McCullough's Dairy Queen formulated the now-famous soft serve ice cream and created the "Dairy Queen" name. Now, ADQ owns the DQ® franchise system and licenses its federally registered trademarks and service marks, including but not limited to the DQ® (Registration No. 960,525), BLIZZARD® (Registration No. 895,139), and DAIRY QUEEN® (Registration No. 728,894) trademarks (the "DQ® Marks"), to franchisees operating more than 7,500 DQ® restaurants across the United States and abroad. These registrations are valid and incontestable within the meaning of 15 U.S.C. § 1065.

20.     Brand uniformity is one of the hallmarks of a franchise system. Every franchised restaurant must appear to customers as part of a unified system, not as an independent enterprise. To that end, ADQ sets system standards for products and services, facilities and premises, and restaurant operations, among other things. This includes standards related to its iconic soft serve products, which are sold at every DQ® restaurant around the world. ADQ's system standards are set forth in the DQ® System Standards and Operations Manual – United States. Each DQ® franchisee benefits from all other DQ® franchisees having to follow these system standards, because the standards allow the DQ® system to meet customer expectations, ensure consumer safety, and protect the DQ® brand's goodwill.

21.     Uniformity in a franchise system also means a problem at one franchise can reverberate through the entire system. This is particularly true for food-and-health-related issues. Customers associate poor product quality and food-and-health issues at one franchise with the entire system. Thus, if one franchisee fails to follow ADQ's food-and-safety procedures resulting in a customer getting sick, then customers may attribute that issue to the rest of the franchise system. ADQ therefore maintains a strict "Zero Tolerance Policy" for certain critical aspects of DQ® restaurant operations related to the quality and safety of DQ® products. ADQ's Zero Tolerance Policy is designed to protect customers and the DQ® brand's goodwill, and to prevent foodborne illnesses.

**B.    The Franchise Agreement**

22.     The Restaurant that is the subject of this dispute is located at 200 Ross Sterling, Anahuac, Texas, 77514 ("Anahuac Restaurant" or "Restaurant"). Until October 16, 2024, the Restaurant operated as a licensed DQ® restaurant pursuant to the Franchise Agreement.

23.     The Franchise Agreement granted UAM's predecessor a license to use the "registered trade name 'DAIRY QUEEN'" and marks in connection with the Anahuac Restaurant.

(Ex. A, § 1.) But the Agreement reserved exclusive ownership over the franchise and its marks in ADQ's predecessor. (*Id.* at 1 (recitals providing that ADQ is the "sole and exclusive owner of the franchise").)

24.     The Agreement also sets forth requirements to ensure the "protection of the good name and reputation" of the franchise and its marks. (*Id.* § 9.) Among other things, the Agreement requires that all food and drink items sold at the Restaurant be "properly prepared so as to enhance the good name and reputation of all 'DAIRY QUEEN' stores." (*Id.* § 9(1).) It also requires all food supplies to comply with the "standards and specifications approved by [ADQ]" at "all times." (*Id.* § 9(2).) And it specifically requires that "[o]nly fresh milk shall be used as liquid parts of malts and shakes." (*Id.*) Section 9 of the Agreement is set forth in relevant part as follows:

> 9. <u>For the further protection of the good name and reputation of "DAIRY QUEEN" products and service, the maintenance of their high standard of quality and for the preservation of the value of the registered trade name "DAIRY QUEEN,"</u> and the high standard of cleanliness and appearance of places of business operated under the trade name "DAIRY QUEEN," <u>it is agreed between the parties hereto as follows:</u>
>
> (1) That Licensee shall purchase supply of Mix for use in such freezers only from such Mix Suppliers as shall furnish Mix containing the high quality ingredients in the proportions required under [ADQ's] formula and properly mixed and manufactured according to the standard instructions furnished by [ADQ]. <u>With respect to all other drinks and food items sold, high quality ingredients are to be used which shall be properly prepared so as to enhance the good name and reputation of all "DAIRY QUEEN" stores.</u>
>
> (2) <u>That all Mix and other food supplies,</u> including meats, buns, vegetables, fruits, drinks, cones, cups, containers, topping, flavoring, coloring and like supplies and materials, <u>shall meet the standards and specifications approved by [ADQ],</u> and such standards of quality must be maintained at all times. <u>Only fresh milk shall be used as liquid parts of malts and shakes.</u>

(*Id.* § 9 (emphasis added).)

25.     The Agreement provides that in the event of "any breach of any covenant or any agreement herein contained," ADQ may terminate the Agreement and revoke the license. (*Id.*

§ 11.) Upon termination of the license, "the Licensee shall thereupon immediately cease all . . . use of the trade name 'DAIRY QUEEN,'" and "all rights that Licensee may have or may have had under this agreement shall cease, terminate and end." (*Id.*)

   C. __The Prohibition on Using and Storing Rerun Protects Customers, Product Quality, and the Goodwill of the DQ® Brand__

26.     ADQ maintains a strict Zero Tolerance Policy for certain critical aspects of DQ® restaurant operations related to the quality and safety of DQ® products. The Zero Tolerance violations are defined in the DQ® System Standards and Operations Manual.

27.     ADQ lists only four categories of Zero Tolerance violations in its System Standards and Operations Manual, § 7.06. One of those categories relates to the storage and use of "rerun":

> (ii) Soft-serve Mix
>     a. Failure to use only approved, non-expired soft serve mix (including chocolate mix).
>     b. Use and/or storage of rerun (mix that has already been run through the soft serve machine).

28.     ADQ has had a "zero-tolerance" policy against using or storing rerun for over 25 years. The purpose of the rule is to protect customer safety and ensure product quality. Poor preparation and storage procedures with soft serve jeopardize both product quality and customer safety. Using or storing rerun raises the chance of bacteria growing in the product, such as listeria.

29.     Listeria infections have a high mortality rate and primarily affect pregnant women, newborns, older adults, and individuals with weakened immune systems. *See Listeria infection*, MAYO CLINIC (Feb. 11, 2022), https://www.mayoclinic.org/diseases-conditions/listeria-infection/symptoms-causes/syc-20355269.

30.     Using rerun thus carries the risk a customer becomes sick from foodborne illnesses, impacting the reputation and goodwill associated with the DQ® Marks, which can reverberate across an entire franchise system for years.

31.     Given the risk to product quality, customers, other franchisees, and the DQ® brand's goodwill, ADQ has made the use and storage of rerun one of its four Zero Tolerance violations. A violation is grounds for immediate default and, if not cured, termination.

**D.  UAM Violated ADQ's Zero Tolerance Policy and Food Preparation Procedures**

32.     On October 8, 2024, an ADQ business consultant conducted a site visit of the Anahuac Restaurant to follow-up on deficiencies that were found during a prior evaluation, including a deficiency relating to the store's use of soft serve mix instead of fresh milk to prepare shakes. During the October 8 site visit, the business consultant found evidence that the Restaurant was storing and using rerun. Specifically, the business consultant found an uncovered pitcher at the soft serve machine with soft serve mix that had already been run through the soft serve machine (i.e., rerun) in it. A true and correct copy of a photograph of the uncovered pitcher is below:



33.     The business consultant also found a second pitcher containing rerun in the walk-in cooler sitting next to a soft serve mix bag. A true and correct copy of a photograph of the second pitcher containing rerun found next to the soft serve mix bag is below:



34.     After finding the rerun, the ADQ business consultant asked one of the employees on duty at the Restaurant to explain how he makes shakes. The employee disclosed that they used melted soft serve (rerun) instead of milk to make shakes. The employee explained that he had been trained to make shakes this way. In fact, there was no fresh milk in the Restaurant available to be used to make shakes.

35.     After the October 8 site visit, the ADQ business consultant prepared a consulting report that was sent to Mr. Aulakh. A true and correct copy of the October 9, 2024 consulting report is attached as **Exhibit C**.

36.     The storage or use of rerun (for any reason) is a violation of ADQ's Zero Tolerance Policy. The use of rerun to make shakes also violates the requirement that only *fresh milk* be used as the liquid part for malts and shakes. Thus, the practice described by the employee violates multiple policies and standards.

37.     On October 10, 2024, ADQ issued a *Zero Tolerance* Notice of Default to UAM, a true and correct copy of which is attached as **Exhibit D**. The Notice advised UAM that it had failed to comply with Sections 9(1) and 9(2) of its Franchise Agreement, which required it to use only soft serve mix and supplies that are approved by ADQ, follow all of ADQ's product preparation procedures, and use only fresh milk as liquid parts of malts and shakes. The Notice explained that the October 8, 2024, site visit had revealed that UAM was storing and using rerun, in violation of ADQ's Zero Tolerance Policy, and failing to use only milk to prepare shakes, all of which violates the terms of UAM's Franchise Agreement. ADQ warned that it would not tolerate this practice under any circumstances and would terminate UAM's Franchise Agreement unless it cured the default within 24 hours "by discontinuing the use and/or storage of rerun." (Ex. D, at 1.)

### E.  UAM Fails to Cure its Default and ADQ Terminates the Franchise Agreement

38.     On October 14, 2024, ADQ conducted a follow-up site visit at the Anahuac Restaurant to confirm that UAM had cured its default. It had not. During the site visit, an ADQ business consultant *again* found that the Anahuac Restaurant was using rerun to make shakes, and also found evidence that it was using soft serve mix in place of fresh milk to prepare shakes.

39.     As with the October 8 visit, the business consultant found there was no milk in the Restaurant for making shakes. When she went to the soft serve machine, the business consultant

found that the Restaurant was using small pitchers to catch runoff from the soft serve machine spigot—i.e., rerun. Then, when she opened the soft serve cabinet, she found a large pitcher containing soft serve mix that appeared to have been poured out of a mix bag into the container. Below is a true and correct copy of a photo showing the pitchers containing rerun on the top of the soft serve machine and the pitcher containing soft serve mix inside the cabinet of the soft serve machine:



40.     When the business consultant asked a Restaurant employee how he had made shakes that day without any fresh milk, the employee explained that he had used the soft serve runoff (rerun) to prepare shakes, as he said the Restaurant had trained him to do.

41.    A true and correct copy of the October 16, 2024 consulting report relating to the October 14, 2024 site visit is attached as **Exhibit E**.

42.    Once again, UAM's practice of using rerun to make shakes is a double violation. It violates not only ADQ's Zero Tolerance Policy on rerun, but also the system and contractual requirement that franchisees use only fresh milk as the liquid parts of malts and shakes. Using soft serve mix in place of fresh milk to make shakes also violates this requirement, which is expressly contained in UAM's Franchise Agreement. (Ex. A, § 9(2).)

43.    As explained above, the use or storage of rerun is detrimental to customers, product quality, and the goodwill of the DQ® brand. Likewise, using unapproved ingredients harms customers and impacts the goodwill of the DQ® brand.

44.    UAM's practice of substituting rerun and/or soft serve mix for fresh milk in its shakes is concerning for yet another reason. When, as UAM did here, a DQ® restaurant replaces the fresh milk in shakes with rerun or soft serve mix, the shakes no longer meet ADQ's published nutritional facts. Instead, the shakes become significantly sweeter and more caloric. This could have ranging implications for customers, such as for customers with diabetes who need to monitor their sugar intake and insulin levels or customers who are monitoring their caloric intake.

45.    For example, below is a true and correct copy of an excerpt from ADQ's website showing the nutritional facts for some of the DQ® shakes:



46.     A medium caramel shake has 750 calories, 26 grams of fat, and 120 grams of carbohydrates. By replacing milk with soft serve or rerun to make the shake, the product composition has changed, and these nutritional facts may no longer be accurate. Accordingly, UAM's practice of substitution is problematic for numerous reasons and is not permitted under any circumstances.

47.     In sum, on October 8th the Anahuac DQ® Restaurant was storing and/or using soft serve mix that had already been run through the soft serve machine—i.e., rerun.

48.     On October 14th, the Anahuac DQ® Restaurant was storing and/or using soft serve mix that had already been run through the soft serve machine—i.e., rerun.

49.     On October 8th, the Anahuac DQ® Restaurant did not have fresh milk available in the store and was not using fresh milk to make shakes for customers.

50.     On October 14th, the Anahuac DQ® Restaurant did not have fresh milk available in the store and was not using fresh milk to make shakes for customers.

51.     Employees at the Anahuac DQ® Restaurant were trained to use rerun and/or soft serve mix in place of using fresh milk to make shakes for customers.

52.     Between October 8th and 14th, UAM did not retrain its employees or otherwise inform them that they were not permitted to use rerun and/or soft serve mix in place of using fresh milk to make shakes for customers.

53.     On October 16, 2024, ADQ informed UAM that it was terminating its franchise effective immediately because of UAM's failure to cure its default. A true and correct copy of the termination notice is attached as **Exhibit F**.

### F.  **UAM's Contractual Violations Were Willful and Deliberate**

54.     On information and belief, UAM's violations as described herein were willful and deliberate.

55.     As described above, UAM employees informed ADQ business consultants that they had been trained to store and use rerun, and even to substitute rerun and/or soft serve mix for fresh milk when making malts and shakes.

56.     ADQ's Zero Tolerance Policy on rerun has been in place for more than 25 years, including the entire time that UAM has operated the Anahuac Restaurant.

57.     ADQ's requirement that only fresh milk be used as liquid parts in malts and shakes has been in place even longer—in fact, it is even written into UAM's Franchise Agreement, which was executed in 1979.

58.     UAM also has personal knowledge about how seriously ADQ takes its Zero Tolerance Policy, including with respect to use or storage of rerun. Mr. Aulakh—the sole owner of UAM—is also a 50% owner of 2-MNA, LLC, an entity that owns and operates another DQ® restaurant in Webster, Texas that ADQ recently terminated for violating its Zero Tolerance Policy relating to the use and/or storage of rerun. Once again, in that matter, a restaurant employee admitted that it was the restaurant's usual practice to prepare and serve to customers Blizzards® made with soft serve mix that had already been run through the soft serve machine (i.e., rerun).

ADQ issued a Notice of Termination relating to the Webster restaurant on August 27, 2024, a true and correct copy of which is attached as **Exhibit G**. The parties are currently in litigation related to the termination. *2-MNA, LLC v. American Dairy Queen Corporation*, Case No. 27-CV-24-12897 (Hennepin Cnty., Minn.).

59.     Mr. Aulakh and UAM were therefore on heightened notice of ADQ's Zero Tolerance Policy even before ADQ issued its Notice of Default. UAM's failure to cure was thus willful and deliberate.

### G. UAM Continues to Unlawfully Operate the Anahuac Restaurant After its Franchise Has Been Terminated

60.     Despite the termination of the franchise on October 16, 2024, UAM continues to operate the Anahuac Restaurant and to use DQ® Marks without a license to do so. On October 17, an ADQ business consultant visited the Anahuac Restaurant, found it was still open, and was able to make purchases from the drive-thru. This continued operation is willful, deliberate, and unlawful, and violates UAM's post-termination contractual obligations and federal law.

61.     Unless enjoined, UAM's unlawful operation of the Anahuac Restaurant using ADQ's marks and brand will cause ADQ irreparable harm, including the undermining of the effectiveness of the DQ® Marks and loss of customer goodwill.

62.     Indeed, as evidenced by its Zero Tolerance Policy, ADQ takes the health and safety of consumers very seriously. If even one person gets sick from eating at a DQ® restaurant, it can create a public relations nightmare and have adverse impacts for the entire brand and every franchisee in the system.

## V. CAUSES OF ACTION

### COUNT 1: DECLARATORY JUDGMENT

63. ADQ realleges the preceding paragraphs of this Complaint as if fully set forth herein.

64. As described in the preceding paragraphs of this Complaint, an actual and justiciable controversy exists between ADQ and UAM with respect to their rights and obligations under the Franchise Agreement.

65. ADQ has complied with all of its obligations under the Franchise Agreement.

66. The Franchise Agreement required UAM to use only soft serve mix and supplies that are approved by ADQ, follow all of ADQ's product preparation procedures, and to use only fresh milk as liquid parts of malts and shakes. (Ex. A, § 9(1), 9(2).) Among other things, ADQ's product preparation procedures prohibit the storage or use of rerun, as described in ADQ's System Standards and Operations Manual, § 7.06.

67. UAM failed to operate the Anahuac Restaurant in conformance with the Franchise Agreement, including by failing to use only fresh milk as the liquid parts of its malts and shakes, and by storing and using rerun.

68. ADQ sent a written Notice of Default on October 10, 2024, alerting UAM that it was in violation of sections 9(1) and 9(2) of the Franchise Agreement and informing UAM that it must cure its default within 24 hours, or its franchise license would be terminated.

69. UAM failed to timely cure its default.

70. The Franchise Agreement authorizes ADQ to terminate the franchise and revoke UAM's license upon "any breach of any covenant or any agreement herein contained." (Ex. A, § 11.)

16

71.     On October 16, 2024, ADQ terminated the Franchise Agreement, effective immediately.

72.     Therefore, ADQ seeks entry of judgment pursuant to 18 U.S.C. § 2201(a) declaring that:

(a)     The Franchise Agreement is a valid and enforceable contract.

(b)     UAM's failure to use only soft serve mix and supplies that are approved by ADQ, to follow all of ADQ's product preparation procedures, and to use only fresh milk as liquid parts of malts and shakes are material breaches of the Franchise Agreement under sections 9(1) and 9(2).

(c)     ADQ validly terminated the Franchise Agreement and UAM's rights thereunder as of October 16, 2024.

(d)     Section 11 of the Franchise Agreement survives the termination of the franchise and bars UAM from continuing to operate the Restaurant or using the DQ® Marks.

**COUNT 2: BREACH OF CONTRACT**

73.     ADQ realleges the preceding paragraphs of this Complaint as if fully set forth herein.

74.     The Franchise Agreement is an enforceable contract between ADQ and UAM. ADQ has fully complied with all of its obligations under the Franchise Agreement.

75.     The Franchise Agreement sets forth post-termination duties with which UAM must comply, including but not limited to, requiring UAM to immediately cease operating the Restaurant and using the DQ® Marks.

76.     ADQ lawfully terminated the Franchise Agreement and UAM's license to use the DQ® Marks on October 16, 2024. UAM's post-termination obligations survive the termination of the Franchise Agreement.

77.     UAM is in material breach of the Agreement by continuing to operate the Anahuac DQ® Restaurant and continuing to use the DQ® Marks after termination.

78.     UAM's breach has deprived ADQ of its right to control the use of its marks and is causing customer confusion and loss of goodwill.

79.     ADQ has suffered and is entitled to damages arising from this breach in an amount to be determined at trial.

### COUNT 3: TRADEMARK INFRINGEMENT IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1114(1)

80.     ADQ realleges the preceding paragraphs of this Complaint as if fully set forth herein.

81.     UAM is using trademarks that ADQ owns all right, title, and interest in, including but not limited to the DQ® (Registration No. 960,525), BLIZZARD® (Registration No. 895,139), and DAIRY QUEEN® (Registration No. 728,894) trademarks. These registrations are valid and subsisting and are incontestable within the meaning of 15 U.S.C. § 1065.

82.     UAM has used the DQ® Marks in a manner that is likely to cause, and in fact has caused, confusion, mistake, and/or deception as to the affiliation, connection, and/or association of UAM with ADQ.

83.     UAM had both actual and constructive knowledge of the above-referenced trademarks. UAM adopted, used, and continued to use in commerce ADQ's federally registered trademarks with full knowledge that its use was infringing. UAM's actions constitute knowing, deliberate, and willful infringement of ADQ's federally registered marks, in violation of Section

32 of the Lanham Act, 15 U.S.C. § 1114(1). The knowing and intentional nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

84.     As a result of UAM's infringement, ADQ has suffered substantial damages, as well as the continuing loss of the goodwill and reputation established by ADQ in its federally registered marks. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which ADQ has no adequate remedy at law. ADQ will continue to suffer irreparable harm unless this Court enjoins UAM's conduct.

85.     UAM's infringement of the rights of ADQ has been knowing, willful and in deliberate disregard of the rights of ADQ. ADQ is therefore entitled to enhanced damages and reasonable attorneys' fees under 15 U.S.C. § 1117(a).

## COUNT 4: UNFAIR COMPETITION
## IN VIOLATION OF THE LANHAM ACT,
## 15 U.S.C. § 1125(a)(1)

86.     ADQ realleges the preceding paragraphs of this Complaint as if fully set forth herein.

87.     The DQ® Marks have been continuously used in connection with the sale of cooked food products, soft serve, frozen and semi-frozen dairy products, frozen and semi-frozen products, and other products and services throughout the United States for decades.

88.     UAM is currently operating a DQ® restaurant and using DQ® Marks without authorization from ADQ, and ADQ has made it clear that it does not approve of UAM's continued operation of the Restaurant or use of the DQ® Marks. On information and belief, UAM is also continuing to produce and sell products bearing the DQ® Marks that fail to comply with ADQ's ingredient and preparation standards and specifications.

89.     These actions have caused and continue to cause devaluation of the DQ® Marks by tarnishing their image and undermining uniformity across the DQ® brand. UAM's

unauthorized operation of a DQ® restaurant and sale of unauthorized products with DQ® Marks creates confusion about the affiliation between DQ® and the Anahuac Restaurant and its nonconforming products, and leaves ADQ powerless to control and manage the DQ® Marks and its brand.

90.     In addition, UAM's sale of products that do not meet ADQ's standards and specifications—including by failing to use only fresh milk as the liquid parts of its malts and shakes, and by storing and using rerun—is likely to cause confusion, mistake, or deception as to both the quality and the source of the products it offers. Specifically, UAM's sale of non-conforming products bearing the DQ® Marks creates confusion by, among other ways, misrepresenting to consumers that UAM's products are actually the certified products of ADQ.

91.     UAM's conduct described herein, and its unauthorized use of the DQ® Marks constitutes a false representation of affiliation, connection, or association in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1). UAM's unauthorized use of the DQ® Marks is likely to cause confusion, mistake, and/or deception in the marketplace as to the quality, characteristics, and source of goods or services, and falsely suggests that UAM's unauthorized, unapproved product offerings are sponsored or approved by ADQ.

92.     Unless enjoined by the Court, UAM will continue to do the acts complained of herein and cause damage and injury, causing irreparable harm to ADQ's business, brand, reputation, and goodwill. ADQ is therefore entitled to injunctive relief and to monetary recovery pursuant to 15 U.S.C. § 1117(a) in an amount to be proven at trial.

93.     UAM's infringement of the rights of ADQ has been knowing, willful and in deliberate disregard of the rights of ADQ. ADQ is therefore entitled to enhanced damages and reasonable attorneys' fees under 15 U.S.C. § 1117(a).

## COUNT 5: COMMON LAW UNFAIR COMPETITION

94.     ADQ realleges the preceding paragraphs of this Complaint as if fully set forth herein.

95.     The acts and conduct of UAM as alleged above in this Complaint constitute unfair competition pursuant to Texas law, including through the passing off of UAM's products and services as those of ADQ.

96.     UAM's acts and conduct as alleged have caused ADQ commercial damage, as well as the continuing loss of the goodwill and reputation of ADQ. This continuing loss of goodwill cannot be properly calculated or remedied in terms of money damages, and constitutes irreparable harm and an injury for which ADQ has no adequate remedy at law. ADQ will continue to suffer irreparable harm unless this Court enjoins UAM's conduct.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff ADQ respectfully requests the Court to enter judgment as follows:

(1)     An order declaring that UAM materially breached its obligations under the Franchise Agreement and that the Agreement was properly terminated effective October 16, 2024;

(2)     Judgment that UAM breached its post-termination obligations under the Franchise Agreement by continuing to operate the Anahuac Restaurant and to use the DQ® Marks, and compensatory damages in an amount to be proven at trial;

(3)     Judgment that UAM has violated Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a)(1), and that ADQ is entitled to damages, including treble damages, pursuant to 15 U.S.C. § 1117(a), in an amount to be proven at trial;

(4)     A temporary and permanent injunction against UAM, preventing the unauthorized operation of the Anahuac Restaurant and use of the DQ® Marks;

(5)    ADQ's reasonable costs and attorneys' fees;

(6)    Prejudgment interest on any monetary award made part of the judgment against UAM; and

(7)    Such other relief as the Court may deem just and proper.

## VII. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), ADQ demands a jury trial on all issues so triable.

Dated: October 23, 2024                */s/ Ricardo G. Cedillo*

**DAVIS, CEDILLO & MENDOZA, INC.**
Ricardo G. Cedillo (04043600)
755 E. Mulberry, Suite 250
San Antonio, Texas 78212
Telephone: 210-822-6666
Fax: (210) 660-3795
rcedillo@lawdcm.com

**FAEGRE DRINKER BIDDLE & REATH LLP**

Lauren W. Linderman (*pro hac vice forthcoming*)
Bryan K. Washburn (*pro hac vice forthcoming*)
Josiah D. Young (*pro hac vice forthcoming*)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: 612-766-7000
Fax: 612-766-1600
lauren.linderman@faegredrinker.com
bryan.washburn@faegredrinker.com
josiah.young@faegredrinker.com

***Attorneys for Plaintiff American Dairy Queen Corporation***

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

American Dairy Queen Corporation,

     Plaintiff,

v.

UAM, LLC,

     Defendant.

Case Number: _____

**Verification of David Giacone**

I, David Giacone, do hereby certify and state:

1.     I am the Vice President of U.S. Operations East for American Dairy Queen Corporation ("ADQ"). In my role, I oversee operations for the Eastern region of the United States, including Texas and also ADQ's system of sublicensors.

2.     I have read the foregoing Verified Complaint, and based on my personal knowledge and information available from business records and other documents in ADQ's possession, custody or control, and the knowledge furnished by ADQ's employees, attorneys, and other agents, the factual allegations contained therein are true and correct to the best of my knowledge, except as to those matters and things alleged upon information and belief, and, as to those things, I believe them to be true.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of October, 2024 in the city of Louisville, in Jefferson County, Kentucky.

*David Giacone*
David Giacone (Oct 22, 2024 13:28 EDT)
David Giacone